**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 27 2014, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN McLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| EDWARD D. BAGSHAW, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 10A01-1305-CR-236 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Vicki L. Carmichael, Judge
Cause No. 10C04-1111-MR-4

**June 27, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

Appellant-Defendant Edward D. Bagshaw killed his ex-wife Kelly Bagshaw by stabbing her fifty-seven times, with the fatal wound being a severed jugular vein. Appellee-Plaintiff the State of Indiana charged Bagshaw with murder, a felony. Bagshaw interposed an insanity defense and was initially evaluated for sanity by two court-appointed doctors, psychologist Dr. Heather Henderson-Galligan, Ph.D., and forensic psychiatrist Dr. Steve Shelton, M.D. Approximately one year after the evaluations and during trial, Bagshaw moved to exclude Dr. Shelton on the basis that Dr. Shelton had previously treated Bagshaw pursuant to Dr. Shelton's contract to provide services to inmates in the Clark County Jail. The trial court granted Bagshaw's motion and ordered Levois Davis, of Forensic Services of Southern Indiana, LLC, to find another evaluator.

Davis located psychiatrist Dr. Kelly Butler, M.D., who then evaluated Bagshaw for sanity and provided a report. Dr. Butler worked in the same practice group as Dr. Shelton and referred to Dr. Henderson-Galligan's report while performing her evaluation. Both Dr. Henderson-Galligan and Dr. Butler, to whose testimony Bagshaw objected, opined at trial that Bagshaw was legally sane when he killed Kelly. The jury found Bagshaw guilty as charged, and the trial court sentenced Bagshaw to sixty-five years of incarceration, with five years suspended to probation. Bagshaw contends that the trial court abused its discretion in allowing Dr. Butler's testimony and that his sentence is inappropriately harsh. We affirm.

## FACTS AND PROCEDURAL HISTORY

2

Bagshaw and Kelly were married in 2004, but, by November of 2011, they had been separated for approximately five months, and Kelly had filed for divorce. The marriage produced Kaylee and Bryce, who were six and two, respectively, in November of 2011. The children were visiting with Bagshaw at his Jeffersonville apartment on November 12 and 13, 2011, and Kelly attempted to retrieve the children in the early afternoon of November 13. Buffy Jackson and her husband, William Johnson, were taking laundry from their apartment to their truck when they heard muffled screaming. When Jackson and Johnson pulled out of their parking space, they noticed Kelly, face-down, in a pool of blood approximately four feet in diameter. Jackson looked up and saw a little girl, who Johnson knew to be Kaylee, looking out of Bagshaw's apartment window at the scene below. Johnson attempted to access Bagshaw's apartment—where he had seen Kaylee—but turned back when he saw blood on the doorknob and in the entryway.

Meanwhile, Bagshaw returned to his apartment and called 911, telling the dispatcher that he thought he had just killed his wife. When police arrived soon thereafter, they found Bagshaw standing in the apartment doorway with blood all over his hands and shirt, Bryce eating ice cream at the kitchen table, and Kaylee still looking out the window. Kaylee told police that she had seen Kelly's vehicle shaking and Kelly falling to the ground, bleeding. A search of Kelly's car uncovered a lock-blade knife with a brass-knuckle grip with a logo that read, "ASSASSIN[.]" State's Ex. 60. Bagshaw had stabbed Kelly fifty-seven times, with the fatal wound being a severed jugular vein in Kelly's neck.

On November 16, 2011, the State charged Bagshaw with murder, and five days later Bagshaw filed a notice of intent to interpose an insanity defense. On November 23, 2011, Dr. Shelton saw Bagshaw in the Clark County Jail pursuant to his contract to provide psychological services to inmates. On November 29, 2011, the trial court appointed Drs. Shelton and Henderson-Galligan to evaluate Bagshaw. On December 1, 2011, Dr. Shelton evaluated Bagshaw and submitted his report the same day. Dr. Henderson-Galligan, a psychologist who practices in Jeffersonville and Louisville, Kentucky, evaluated Bagshaw on December 6, 2011, and submitted her report on January 20, 2012.

Bagshaw's trial began on January 8, 2013. The first expert evaluation of Bagshaw's sanity heard by the jury was that of Dr. George Parker, M.D., who was retained and called by Bagshaw. Dr. Parker opined that Bagshaw suffered from moderate to severe depression and dissociative amnesia, but also testified that he was unable to determine whether Bagshaw was sane or insane when he killed Kelly. On January 15, 2013, after Bagshaw rested, the trial court called the first of its appointed experts, Dr. Henderson-Galligan. Dr. Henderson-Galligan testified that although she had diagnosed Bagshaw with major depression with psychotic features, he was able to appreciate the wrongfulness of his actions at the time of Kelly's death.

On January 16, 2013, Bagshaw sought to voir dire Dr. Shelton before he gave his testimony. During voir dire, Dr. Shelton affirmed that he had seen and treated Bagshaw prior to his appointment by the court. Bagshaw moved to exclude Dr. Shelton on the basis that he had a conflict of interest, which motion the trial court granted. The trial court notified the

4

jury that an unavailable witness had resulted in a two-day adjournment. The trial court arranged with Davis to locate another evaluator, and Davis located Dr. Butler, who interviewed Bagshaw on January 17, 2013. Dr. Butler interviewed Bagshaw at the Clark County Jail for over an hour between 1:09 and 2:36 p.m. Dr. Butler prepared and, that evening, sent Davis electronic copies of both a draft report and, later, a final report.

On January 18, 2013, the trial court contacted Davis and requested that he deliver Dr. Butler's report to the court. In error, Davis printed a copy of Dr. Butler's unsigned draft report and brought it to court. Also that day, Bagshaw filed a motion to exclude Dr. Butler's testimony as well, alleging that she had only interviewed Bagshaw for fifteen minutes and had not "review[ed] any information regarding the alleged offense" before the interview. Appellant's App. p. 121. Bagshaw also alleged that Dr. Butler had repeatedly used and referred to Dr. Shelton's evaluation during her own evaluation and that her professional association with Dr. Shelton warranted her exclusion. The trial court held a hearing on Bagshaw's motion to exclude Dr. Butler.

At the hearing, Dr. Butler testified that she interviewed Bagshaw on January 17, 2013, for approximately one hour and fifteen minutes. Additionally, Dr. Butler testified that she referred to a list of Bagshaw's medications and Dr. Henderson-Galligan's report, which report Davis had provided and which she reviewed for background purposes and to identify inconsistent statements Bagshaw might make. Davis had also provided both Drs. Butler and Henderson-Galligan with a draft "finishing paragraph so there's no misunderstanding that they're following Indiana Code," which Davis routinely provided to psychologists and

5

psychiatrists performing sanity evaluations. Tr. p. 824. Dr. Butler testified that she did not make use of Dr. Shelton's report, believing that it would have been inappropriate to do so. Dr. Butler also reviewed police reports, Bagshaw's videotaped police interview, and crime scene photographs, spent "quite a lot of time" reviewing the professional guidelines relevant to her evaluation and, all told, spent approximately six hours preparing a report. Tr. p. 795. Dr. Butler testified that professional guidelines did not prevent her from referring to Dr. Henderson-Galligan's report.

Bagshaw examined Dr. Butler regarding the draft report that Davis had brought to court, focusing on the disposition paragraph and its similarity to the disposition paragraph in Dr. Henderson-Galligan's report. The disposition of Dr. Henderson-Galligan's report reads as follows:

> In accordance with I.C. 35-41-3-6,[1] Mr. Bagshaw is a cognitively and mentally intact individual. At present, he is able to articulate his current charges. It is the opinion of this examiner that Edward "Dale" Bagshaw did indeed engage in prohibitive [sic] conduct and does not appear to be mentally insane at this time, nor at the time of the alleged event, and he does have the capacity to appreciate the wrongfulness of his alleged conduct and offense at the time of the events on November 13, 2011.

Court's Ex. 2. The disposition of Dr. Butler's draft report reads as follows:

> In accordance with IC 35-41-3-6, Mr. Bagshaw is a cognitively and mentally intact individual. At the present time, he is able to articulate and understand the charges against him. It is the opinion of this examiner that Edward "Dale" Bagshaw did indeed engage in prohibitive [sic] conduct and does not appear to be mentally insane at this time, nor at the time of the alleged event, and he

---

[1] Indiana Code section 35-41-3-6(a) provides that "[a] person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense."

does have the capacity to appreciate the wrongfulness of his conduct and offense at the time of the event of 11/13/11.

Defendant's Ex. 12. Bagshaw requested that Dr. Butler be excluded based on her employment in Dr. Shelton's practice and because her review of Dr. Henderson-Galligan's report called the entire process into question. The trial court ruled that Dr. Butler could testify.

Following a recess, the trial court called Dr. Butler to the stand. Dr. Butler opined that Bagshaw was sane at the time of Kelly's death. Dr. Butler also brought her final report to court, which was admitted into evidence. The conclusion paragraph of Dr. Butler's final report reads as follows:

> Therefore, pursuant to Indiana Code 35-41-3-6, this Mr. Bagshaw is responsible for having engaged in prohibited conduct and does not appear to be mentally insane at this time or at the time of this act, as he was able to appreciate the wrongfulness of the conduct at the time of his offense on the night of 11/13/11.

Court's Ex. 4.

When Bagshaw examined Dr. Butler, he asked her if her disposition contained the language from Dr. Henderson-Galligan's report stating that Bagshaw was "a cognitively and mentally intact individual[,]" and Dr. Butler replied that it did not. Tr. p. 881. At this point, the trial court noticed that the language in the final report did not match the copy that Davis had provided the trial court and excused the jury. Bagshaw noted that he had just conducted voir dire on Dr. Butler for forty minutes based on the draft report without Dr. Butler pointing out the discrepancy, and he argued that "[t]he whole process has totally been gutted by the way it's going down." Tr. p. 885. After being given a chance to review the final report,

7

Bagshaw moved for a mistrial on the basis that jury confusion regarding the different reports adversely affected his ability to receive a fair trial.

The trial court called Dr. Butler back in for questioning. Dr. Butler explained that she was given a transcription copy of her report at approximately 4:30 p.m. the day before but that she had revised it, finishing her revisions at approximately 7:30 p.m. Dr. Butler emailed copies of both reports to Davis. When questioned, Davis explained that both versions of the report were sent to him with "exactly the same name" and that he printed out the wrong one "in [a] rush this morning to get it to the Court[.]" Tr. pp. 894-95. Bagshaw renewed his request to have Dr. Butler excluded, which request the trial court denied, remarking that the issues raised by Bagshaw could be "brought out in cross-examination and brought out in closing to the jury[.]" Tr. p. 898.

Back in front of the jury, Bagshaw examined Dr. Butler on the similarities between the final paragraph of her draft report (which was also admitted into evidence) and the final paragraph of Dr. Henderson-Galligan's report. Dr. Butler testified that she had used the concluding paragraph of Dr. Henderson-Galligan's as a reference for the legal conclusions contained in her final report. When Dr. Butler finished testifying, Bagshaw was allowed to present telephonic testimony from Dr. Parker, who testified that, in his opinion, an "independent" evaluator should avoid learning about reports by other persons evaluating a defendant because of the possibility of inaccurate information or being swayed by an especially well-written report. Tr. p. 934. The jury found Bagshaw guilty of murder. On

April 22, 2013, the trial court sentenced Bagshaw to sixty-five years of incarceration, with five years suspended to probation.

## DISCUSSION AND DECISION

## I. Whether the Trial Court Abused its Discretion in Allowing Dr. Butler to Testify

The admissibility of evidence is within the sound discretion of the trial court. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002). We will only reverse a trial court's decision on the admissibility of evidence upon a showing of an abuse of that discretion. *Id.* An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005). We do not reweigh the evidence and consider the evidence most favorable to the trial court's ruling. *Hirsey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006).

## A. Dr. Butler's Qualifications

Bagshaw contends that Dr. Butler lacked the experience to conduct a sanity evaluation. Indiana Evidence Rule 702, which governs opinion testimony by experts, provides, in relevant part, as follows:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Bagshaw argues that Dr. Butler lacked the necessary skill, knowledge, or experience

9

to perform a sanity evaluation. Initially, we note that pursuant to the plain language of Rule 702(a), an expert witness may be qualified to offer an expert opinion by virtue of knowledge, skill, experience, training, *or* education, and Bagshaw does not argue that Dr. Butler lacked sufficient training or education. Dr. Butler had been practicing psychiatry for eleven years, had treated several thousands of patients, is board-certified in psychiatry, and had been trained in sanity evaluations during her residency. Essentially, Bagshaw's argument is based on the fact that this was Dr. Butler's first sanity evaluation, and we will, for fairly obvious reasons, not adopt a rule that all first sanity evaluations must be rejected out-of-hand. Bagshaw has failed to establish that Dr. Butler was unqualified pursuant to Rule 702.

## B. Dr. Butler's Evaluation Technique

Bagshaw contends that, even if Dr. Butler were qualified to conduct a sanity evaluation, she failed to conform to the applicable guidelines for doing so. Bagshaw argues that Dr. Butler's interview of Bagshaw was not lengthy enough, she failed to adequately prepare for the interview, and she improperly reviewed Dr. Henderson-Galligan's report. Bagshaw relies heavily on his Exhibit 10, an article that appeared in the Journal of the American Academy of Psychiatry and the Law entitled "Practice Guideline: Evaluation of Competence to Stand Trial." We find this argument unavailing. First, Bagshaw has not established that his Exhibit 10 represents anything like a universally-accepted methodology for psychological evaluations in a legal setting. Second, even assuming, *arguendo*, that the article is somehow binding in some context, the question in this case is not whether Bagshaw

10

was competent to stand trial, but whether he was insane when he killed Kelly.[2]  Finally, even if we were to accept that Bagshaw's Exhibit 10 somehow applied to Dr. Butler's evaluation, nothing in it establishes that her interview was *per se* too short, that she inadequately prepared for it, or that reviewing Dr. Henderson-Galligan's report was somehow improper. Additionally, Dr. Butler testified that her review of Dr. Henderson-Galligan's report did not affect her objectivity in any way.  Although Dr. Parker testified that an evaluator might be improperly influenced by the report of another, there is no indication that Dr. Butler was so influenced, and, in any event, the jury was free to disregard Dr. Parker's opinion.  Bagshaw has failed to establish that Dr. Butler's methodology was fatally flawed.

### C.  Dr. Butler's Professional Relationship with Dr. Shelton

Finally, Bagshaw argues that Dr. Butler's employment in the same practice group as Dr. Shelton should have resulted in Dr. Butler's exclusion.  Put another way, because Dr. Shelton was found to not be disinterested, Dr. Butler cannot be disinterested by virtue of their professional relationship.  Bagshaw, however, does not claim, much less establish, that Drs. Shelton and Butler ever even spoke to one another regarding Bagshaw's case, much less that they somehow improperly collaborated.  The Indiana Supreme Court concluded, in a case where the two psychiatrists who performed the sanity evaluation were brothers who shared a practice, "that the psychiatrists in this case were not inherently biased simply because they shared professional and familial relationships.  They conducted separate examinations and

---

[2]  In Indiana, one is competent to stand trial if one has "the ability to understand the proceedings and assist in the preparation of a defense[.]"  Ind. Code § 35-36-3-1(a).

reached independent conclusions, just as unrelated psychiatrists would have done under the same circumstances." *Stratton v. State*, 499 N.E.2d 1123, 1124 (Ind. 1986). The record indicates that Drs. Shelton and Butler conducted completely separate evaluations and reached independent conclusions regarding Bagshaw's sanity. As such, despite Dr. Shelton's exclusion, Bagshaw has failed to establish that the trial court abused its discretion in refusing to exclude Dr. Butler because she practices with Dr. Shelton.

### D. Different Versions of Dr. Butler's Report

Finally, Bagshaw contends that Dr. Butler should have been excluded because she allegedly, and improperly, "changed" her report during trial. The record does not support this allegation. At most, the record indicates that Davis accidentally printed and brought to court a copy of Dr. Butler's draft report, which Bagshaw used during a voir dire of Dr. Butler. Eventually, the mistake was discovered, and the final report, which had been brought by Dr. Butler, was admitted into evidence. Reduced to its essence, Bagshaw's argument seems to be that some impropriety was committed that requires Dr. Butler's exclusion. The record indicates that only a simple mistake was committed, one that was quickly corrected. Bagshaw has failed to establish that the trial court abused its discretion in allowing Dr. Butler to testify.

### II. Whether the Trial Court Abused its Discretion in Denying Bagshaw's Motion for Mistrial

Bagshaw contends that the trial court abused its discretion in denying his mistrial motion, which was based on his allegation that Dr. Butler "changed" her report.

We review a trial court's decision to deny a mistrial for abuse of

> discretion because the trial court is in "the best position to gauge the surrounding circumstances of an event and its impact on the jury." *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004). A mistrial is appropriate only when the questioned conduct is "so prejudicial and inflammatory that [the defendant] was placed in a position of grave peril to which he should not have been subjected." *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001) (quoting *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989)). The gravity of the peril is measured by the conduct's probable persuasive effect on the jury. *Id*.

*Pittman v. State*, 885 N.E.2d 1246, 1255 (Ind. 2008).

> When faced with a circumstance that a defendant believes might warrant mistrial,

> [g]enerally, the correct procedure is to request an admonishment. *See Brown v. State*, 572 N.E.2d 496, 498 (Ind. 1991). However, if counsel is not satisfied with the admonishment or it is obvious that the admonishment will not be sufficient to cure the error, counsel may then move for a mistrial. *See Dresser v. State*, 454 N.E.2d 406, 407-08 (Ind. 1983). [A] failure to request an admonishment or move for a mistrial results in waiver of the issue. *See Robinson v. State*, 693 N.E.2d 548, 552 (Ind. 1998).

*Etienne v. State*, 716 N.E.2d 457, 461 (Ind. 1999). Here, although Bagshaw requested a mistrial, he did not first request an admonishment. As such, Bagshaw has waived the issue for appellate review.

Even if Bagshaw had properly preserved the issue, we would conclude that the trial court did not abuse its discretion in denying Bagshaw's mistrial motion. Put simply, there is no indication that the confusion surrounding the two reports had any effect on the jury whatsoever. Bagshaw suggests that his trial counsel's seeming confusion regarding his client's case affected the jury in a way detrimental to him. The record, however, does not support a conclusion that the jury had any idea that Bagshaw's trial counsel was ever confused regarding different versions of the report. While it may be true that Bagshaw's questioned Dr. Butler while referring to her draft report and believing it to be the final report,

13

this only occurred during a voir dire that occurred outside the jury's presence. The only references to the draft report made in front of the jury made it clear that it was, indeed, the draft report. Bagshaw has failed to establish that he was placed in grave peril such that mistrial was warranted.

### III.  Whether Bagshaw's Sentence is Inappropriate

We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years." Ind. Code § 35-50-2-3. As previously mentioned, the trial court sentenced Bagshaw to a sentence of sixty-five years of incarceration, with five years suspended to probation.

The nature of Bagshaw's offense warrants an enhanced sentence. Bagshaw did not just kill Kelly, he stabbed her fifty-seven times, including the fatal blow and numerous defensive wounds, one of which went straight through Kelly's forearm. Bagshaw's crime does not seem to have been impulsive—it occurred in Kelly's car and was committed with a knife Bagshaw brought from his apartment. Moreover, the record indicates that Kelly did not

14

die immediately: it would have taken several minutes for Kelly to lose consciousness, and she would have felt her wounds. Bagshaw's murder of Kelly was also committed in such a way that her six-year-old daughter Kaylee witnessed portions of the attack and watched her mother die. As for Bagshaw's character, he notes that did not have a significant criminal history when he murdered Kelly and that he was gainfully employed. That said, Bagshaw's character is still that of a man who brutally murdered his ex-wife in front of one of their children, effectively orphaning those children in the process. In light of the nature of Bagshaw's offense and his character, we cannot say that he has established that his sixty-five-year sentence, with five years suspended to probation, is inappropriate.

The judgment of the trial court is affirmed.

RILEY, J., and ROBB, J., concur.